## DEPARTMENT OF ECONOMIC DEVELOPMENT, Plaintiff,

v.

## ARTHUR ANDERSEN & CO. (U.S.A.), Arthur Andersen & Co. (Republic of Ireland), and Arthur Andersen & Co. (United Kingdom), Defendants–Third–Party Plaintiffs,

v.

## Alex H. FETHERSTON, C. Shaun Harte, Ronald J. Henderson, Anthony S. Hopkins, and James Sim, Third–Party Defendants.

No. 85 Civ. 1292 (CES).

United States District Court, S.D. New York.

Jan. 8, 1990.

Mudge, Rose, Guthrie, Alexander & Ferdon by Malcolm R. Schade, Robert Sidorsky, New York City, for plaintiff.

Breed, Abbott and Morgan by James D. Zirin, James J. Sabella, Adrian V. White,

Alan J. Sorkowitz, New York City, for defendants-third-party plaintiffs.

Schoeman, Marsh & Updike by David S. Pennock, New York City, for third-party defendants.

## MEMORANDUM DECISION

### STEWART, District Judge:

Defendants/third-party plaintiffs Arthur Andersen & Co. (USA) ("AA–US"), Arthur Andersen & Company (Republic of Ireland) ("AA–Ireland"), and Arthur Andersen & Co. (United Kingdom) ("AA–UK") (hereinafter collectively "AA"), impleaded third-party defendants Alex H. Fetherstone, C. Shaun Harte, Ronald J. Henderson, Anthony S. Hopkins, and James Sim, members at various times of the boards of directors of DeLorean Motor Company ("DMC") and/or DeLorean Motor Cars Limited ("DMCL"), alleging causes of action arising from circumstances involved in the main lawsuit (or "main action") brought by plaintiff Department of Economic Development ("DED") against AA.[1] The third-party defendants (the "NIDA Directors") now move to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.[2]

### Factual Background

The main action in this lawsuit was commenced by plaintiff DED, an agency of the British government, against AA in February of 1985. Although we have previously summarized the background to the main action, see *Department of Economic Development v. Arthur Andersen & Co., et al.*, 683 F.Supp. 1463, 1468–70 (S.D.N.Y. 1988) (the "March 8th Decision"), a brief reiteration of the circumstances surrounding the main action is necessary to understand the facts relevant to the instant motion.

DED's predecessors in interest, the Northern Ireland Development Agency ("NIDA") and the Department of Commerce ("DOC") (collectively "DED" or "plaintiffs") were agencies of the British government empowered to extend loans and grants to businesses to promote the industrial development of Northern Ireland. NIDA and DOC entered into a contract (the "Master Agreement") with various corporations controlled by John Z. DeLorean to manufacture a sports car in Dunmurray, Northern Ireland.

The DMC was incorporated in Michigan in 1975 for the purpose of developing, manufacturing, and marketing the sports car. The manufacturing work on the car was performed at the plant of DMCL, the Northern Ireland subsidiary of DMC. Pursuant to the Master Agreement, NIDA and DOC agreed, *inter alia*, to purchase all of the 17,757,000 preferred shares of DMCL stock at one British pound per share. NIDA and DOC also agreed to extend a variety of grants, loans, and loan guarantees.

Also pursuant to the Master Agreement, DMC undertook to furnish to NIDA and DOC financial statements encompassing DMC and its subsidiaries, including DMCL. AA, as DMC's auditors, prepared reports certifying these statements. The gravamen of DED's complaint in the main action is that DMC's financial statements were false and misleading, and that by certifying

---

**1.** AA's Amended Complaint sets forth five claims for relief:

    1. The third-party defendants indemnify AA or contribute their equitable share should AA be held liable to DED;

    2. The third-party defendants have aided and abetted one or more violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(a), (b) and (c);

    3. The third-party defendants have committed common law fraud upon AA;

    4. The third-party defendants have aided and abetted a common law fraud upon AA;

    5. The third-party defendants have breached a duty of care owed by them to AA.

**2.** Third-party defendants submit material outside the pleadings for our consideration and implicitly invite our conversion of the instant motion into one for summary judgment pursuant to Fed.R.Civ.P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss ... matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...."). *See* June 8, 1989 Affidavit of James D. Zirin and Exhibits. We decline the invitation.

these statements, AA substantially assisted DeLorean and others in the execution of a fraudulent scheme to siphon money from DMC and DMCL.

In addition, the Master Agreement allowed the British government to designate two directors who would sit on the board of DMC and two directors who would sit on the board of DMCL. These directors, third-party defendants herein, also would serve as members of DMC's audit committee and the NIDA monitoring committee which evaluated, *inter alia*, DMCL's performance.

Amid allegations of mismanagement and fraud, the various DeLorean corporations began to collapse in 1981–82. In 1982, DMCL was placed in receivership, and DMC filed a petition for bankruptcy under Chapter 11 of the Bankruptcy Code. In 1983, the Chapter 11 proceeding was converted into Chapter 7 liquidation proceeding.

The core of defendants/third-party plaintiffs' complaint against the NIDA Directors is AA's allegation that it relied in part upon the NIDA Directors as to the accuracy of the DMC and DMCL financial statements. Third–Party Plaintiffs' Memorandum In Opposition to Motion To Dismiss The Amended Third–Party Complaint ("Third–Party Pltfs' Memo.") at 9–10. AA contends that if DeLorean and others were engaged in unlawful conduct, the NIDA Directors had actual or constructive knowledge of the fraudulent activity and failed to disclose the facts to AA, NIDA, or other board members of DMC or DMCL. *Id.* at 10. According to AA, the result of this non-disclosure was that AA's audit reports did not reflect the alleged fraudulent scheme, causing injury to its professional reputation and exposing it to liability. *Id.*

Third-party defendants now move to dismiss the third-party complaint on numerous grounds:

1) there is no contractual or legal right to indemnity in the action;

2) contribution is unavailable in this action under common law as well as under RICO and applicable securities laws;

3) the fraud-based claims fail to satisfy the particularity requirement of Fed.R. Civ.P. 9(b);

4) AA lacks standing to bring the aiding and abetting claims under RICO, the common law fraud and negligence claims;

5) the aiding and abetting claims under RICO and the common law fraud and negligence claims fail to allege cognizable damages;

6) the RICO claim, fraud-based claims, and the negligence claim are barred by the applicable statutes of limitations;

7) lack of personal jurisdiction over the third-party defendants.

For the reasons that follow we grant the third-party defendants' motion to dismiss the second, third, fourth, and fifth causes of action. We also grant the third-party defendants' motion to dismiss individual third-party defendant Ronald J. Henderson for lack of personal jurisdiction. We further partially grant the third-party defendants' motion to dismiss the first cause of action with respect to the third-party plaintiffs' claim for indemnity under RICO, the federal securities laws and common law fraud, and contribution under RICO and the federal securities laws.

Discussion

*Personal Jurisdiction Over Third–Party Defendant Henderson*

The NIDA Directors argue that no personal jurisdiction exists over third-party defendant Henderson because of the following: (1) he never attended any board meetings in New York; (2) the board meeting at which he approved a certain contract between DMCL and GPD Services, Inc., the root of the third-party plaintiffs' claims, was held in Northern Ireland; [3] (3) the GPD contract was negotiated, executed

---

**3.** The third-party complaint alleges that approximately $17.65 million was unlawfully converted by DeLorean and other pursuant to a fraudulent agreement, approved by the NIDA Directors, between the DeLorean Research Limited Partnership ("DRLP") and DMC and GPD Services, Inc. (the "GPD contract").

and performed outside of New York.[4] *See* Third–Party Defts' Rebuttal Memo. at 25.

AA counters that personal jurisdiction exists over Henderson pursuant to New York's "long-arm" statute, New York Civil Practice Law and Rules ("CPLR") § 302(a)(1), because: (1) the GPD contract, approved by Henderson, had substantial connection with New York;[5] (2) Henderson countersigned a letter addressed to a New York firm; and, (3) the DMCL's transaction of business in New York subjects Henderson, as a member of its board, to personal jurisdiction.[6]

Under New York law, personal jurisdiction may be had over a non-domiciliary defendant if there is "proof of one transaction in New York ... even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 198–99, 522 N.E.2d 40, 43 (1988) (non-domiciliary defendant who never was physically present in New York was subject to personal jurisdiction since he exercised "some control" over New York company acting as agent for defendant's foreign company); *see also Picard v. Elbaum*, 707 F.Supp. 144, 145 (S.D.N.Y.1989) (fact that non-domiciliary never physically present in New York is not controlling for long-arm jurisdictional purposes).

■ In view of the connections between New York and the GPD contract, it is our view that DMCL could be deemed to have "transacted business" in New York within the meaning of CPLR § 302(a)(1). *See Sterling National Bank & Trust Co. of New York v. Fidelity Mortgage Investors*, 510 F.2d 870, 873 (2d Cir.1975) ("transacting business" standard is whether "looking at the totality of defendant's activities within the forum" purposeful acts have been performed in New York). However, since Henderson as an individual board member of DMCL is the third-party defendant and not DMCL itself, it is necessary to determine the parameters of New York's long-arm jurisdiction with respect to corporate officers and directors.

Citing inconsistent holdings of federal and state courts regarding the individual liability of corporate officers acting in a corporate capacity, the New York State Court of Appeals recently unequivocally held that a corporate fiduciary from is not exempt from personal jurisdiction even though his or her activities in the forum are solely in a corporate capacity. *See Kreutter*, 71 N.Y.2d at 472, 527 N.Y.S.2d at 202, 522 N.E.2d at 46–47 ("fiduciary shield" doctrine unavailable to defeat long-arm jurisdiction). However, the instant circumstance is the converse of the typical "fiduciary shield" situation. That is, we must determine whether New York law will allow the exercise of personal jurisdiction over a non-domiciliary corporate director who never physically was present in the forum, solely on the basis that long-

---

**4.** While the third-party defendants initially moved for dismissal for lack of personal jurisdiction as to all the NIDA Directors, they apparently have dropped this contention for the purposes of this motion with respect to defendants Fetherstone, Harte, Hopkins and Sim, and continue to press the personal jurisdiction issue only with respect to Henderson. *See* Third–Party Defts' Reply Memo. at 66–67; Third–Party Defendants' Rebuttal Memorandum of Law in Support of Motion to Dismiss ("Third–Party Defts' Rebuttal Memo.") at 25–26.

**5.** AA avers that the GPD contract, approved by the DMCL Board in Northern Ireland, had the following New York contacts: (1) drafts of it were reviewed by DMC's New York counsel; (2) the GPD contract recites that New York law governs disputes under the contract; (3) the monies paid from DRLP to GPD pursuant to the contract were on New York checks; (4) the legal opinion respecting the deductibility of payments to GPD was rendered by a New York firm; (5) the DRLP was put together by Oppenheimer & Co. in New York. Third–Party Pltfs' Memo. at 87.

**6.** CPLR § 302(a)(1) reads in relevant part:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state....

arm jurisdiction exists over the corporation on whose board he sits.

Other circuits have formulated a rule that jurisdiction over the individual officers of a corporation may not be based merely on jurisdiction over the corporation. *See Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 906 (1st Cir.1980) (citing *Weller v. Cromwell Oil Co.*, 504 F.2d 927 (6th Cir.1974) and *Wilshire Oil Co. of Texas v. Riffe*, 409 F.2d 1277 (10th Cir. 1969)). The New York Court of Appeals, construing § 302(a)(1) held that a controlling stockholder of a New York corporation, who never was present in New York and whose individual activity took place outside New York, was not subject to personal jurisdiction absent a showing that he, as an individual, engaged in some purposeful activity in New York. *See Ferrante Equipment Co. v. Lasker–Goldman Corp.*, 26 N.Y.2d 280, 283–84, 309 N.Y.S.2d 913, 916–917, 258 N.E.2d 202, 204–05 (N.Y. 1970).

Accordingly, we conclude that defendant Henderson is not subject to personal jurisdiction in New York pursuant to CPLR § 302(a)(1). It is our view that looking at the totality of Henderson's alleged activities relating to New York—his vote to ratify the GPD contract at a Northern Ireland board meeting and his countersignature on a letter addressed to a New York firm—is insufficient to confer long-arm jurisdiction over him since in our view he engaged in no purposeful activity in New York. *Cf. Cutco Industries v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986) (the totality of all defendant's contacts with the forum state must indicate that jurisdiction would be proper); *McKee Electric Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 382, 283 N.Y. S.2d 34, 38, 229 N.E.2d 604, 607–08 (N.Y. 1967) (minimum contact for exercise of personal jurisdiction is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 382, 283 N.Y.S.2d at 37–38, 229 N.E.2d at 607 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)).

In addition, no personal jurisdiction may be obtained over Henderson pursuant to CPLR § 302(a)(2) which confers jurisdiction over a person who "commits a tortious act within the state" since jurisdiction under this subsection requires that the defendant be physically present within the state while committing the tort. *See, e.g., Paul v. Premier Electrical Construction Company*, 576 F.Supp. 384, 389 (S.D.N.Y. 1983). Finally, no jurisdiction may be had over Henderson pursuant to CPLR § 302(a)(3) since, even if we accept AA's contention that Henderson's ratification of the GPD contract constituted tortious behavior outside New York which caused AA injury within New York, AA makes no argument that the other requirements for personal jurisdiction over Henderson pursuant to § 302(a)(3) are satisfied.[7]

Should we find no basis for jurisdiction over Henderson, AA asks that we grant them leave to conduct further discovery as to Henderson's amenability to suit in New York. *See Peterson v. Spartan Industries, Inc.*, 33 N.Y.2d 463, 354 N.Y.S.2d 905, 310 N.E.2d 513 (1974) (discovery as to jurisdiction may be had if plaintiffs have made a "sufficient start" and show their position not to be frivolous). We decline to do so. In *Peterson*, although articulated in the context of a summary judgment motion, the "sufficient start" necessary to allow further discovery as to the jurisdictional issue was the demonstration by the plaintiff that facts "may exist" to defeat the motion. *Id.* at 466, 354 N.Y. S.2d at 907–08, 310 N.E.2d at 514. No

---

7. CPLR § 302(a)(3) requires that a court may exercise personal jurisdiction over a defendant who:

3. commits a tortious act without the state causing injury to person or property within the state ... if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequence in the state and derives substantial revenue from interstate or international commerce.

**930**

attempt has been made by AA to articulate jurisdictional facts that "may exist" which further discovery would substantiate. Accordingly, we deny AA's application for further discovery as to Henderson and grant the third-party defendants' motion to dismiss Henderson as a third-party defendant in this action for lack of personal jurisdiction.

*Indemnity*

AA rests its indemnification claim on its assertion that its alleged misconduct "pales by comparison to the egregiousness of the NIDA Directors' primary wrongdoing." Third–Party Pltfs' Memo. at 14. AA argues that implied indemnification is permitted by a "balancing of responsibility" between parties responsible for injury to another, and if there is great disparity in the fault of the tortfeasors, the party with substantially lesser fault should be entitled to indemnification.

■■■ Application of tort-based indemnification, or "implied in law" indemnification, is applicable "when the proposed indemnitor has breached a duty to a third party but the proposed indemnitee has paid the third party for the loss attributable to that breach." *Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.,* 782 F.2d 346, 351 (2d Cir.1986). Since implied indemnity allows one who was compelled to pay for the wrong of another to shift the entire loss to the actual wrongdoer, we agree with the late Judge Weinfeld that "where the party seeking indemnification is himself at least partially at fault, indemnity will not be implied." *Massachusetts Mutual Life Insurance Co. v. Weinbach,* 635 F.Supp. 1460, 1462 (S.D.N.Y.1986) (quoting *Hanley v. Fox,* 97 A.D.2d 606, 468 N.Y. S.2d 193, 194 (3d Dep't 1983)); *cf. Morse/Diesel, Inc. v. Trinity Industries, Inc.,* 655 F.Supp. 346, 360 (S.D.N.Y.1987) (issue in contribution is degree of responsibility whereas indemnity shifts entire loss to another party who should bear responsibility because it is the actual wrongdoer), *rev'd on other grounds,* 859 F.2d 242 (2d Cir.1988).

AA argues that "implied in law" indemnity is available when there is a "great disparity" of fault. *See Goodpasture,* 782 F.2d at 351 (citing *Zapico v. Bucyrus–Erie Co.,* 579 F.2d 714, 718 (2d Cir.1978)). However, *Zapico* addressed tort indemnity as a device used by courts to "throw the whole loss upon the more guilty of the two [joint tortfeasors]" in the period when the old common law rule, since abrogated, barred contribution among joint tortfeasors. *See Zapico,* 579 F.2d at 718. Indeed, in *Great American Insurance Co. v. United States,* 575 F.2d 1031, 1035 (2d Cir.1978), the Second Circuit's articulation of the right to indemnity where one tortfeasor's fault "substantially overshadows" that of another was in the context "where an *innocent* party has become subject to liability. ... [and] upon the discharge of such liability the *innocent* party by operation of law is entitled to indemnity to the extent that he discharges the liability." *Id.* (emphasis added). Therefore, the context of Second Circuit formulations of tort-based implied indemnity has been where the disparity of relative fault has been so great that it renders the party seeking indemnification essentially innocent of the wrong committed.

We believe that relevant case law in this circuit allows us to conclude that implied indemnity is unavailable when the party seeking the indemnity is also found to have wrongfully contributed to the plaintiff's injury. We agree with the third-party defendants that to construe "implied indemnity" to include such situations would eviscerate the notion of contribution. In fact, notwithstanding the Second Circuit cases such as *Goodpasture, supra,* which discuss its theoretical applicability, we question whether "implied tort-based indemnity" remains for all practical purposes a viable cause of action in this circuit. However, pending further indication from the Second Circuit, we are constrained to assume that such a cause of action still survives.

■■■ We cannot at this juncture determine whether there will be a finding of liability as to AA in the main action and if liability is found, whether it will meet this

circuit's stringent "implied indemnity" requirement that the implied indemnitee be an "innocent party." Accordingly, we cannot completely dismiss the third-party plaintiffs' claims for indemnity. Nevertheless, we do hold as a matter of law that indemnity is unavailable as to those claims in the main action where AA is found to have recklessly or intentionally contributed to plaintiff's injury. *See Massachusetts Mutual Life Insurance Co.*, 635 F.Supp. at 1462 (indemnity cannot be implied in fraud action since any liability requires proof of intentional conduct); *cf. Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1288 (2d Cir.1969) ("It is well established that one cannot insure himself against his own reckless, wilful or criminal misconduct"), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970).

The NIDA Directors argue that indemnity is unavailable under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("§ 10(b)"). The Fifth, Seventh and Ninth Circuits have concluded that indemnity is generally unavailable under the federal securities laws. *See King v. Gibbs*, 876 F.2d 1275, 1282 (7th Cir.1989) (no implied right to indemnification under the securities laws and federal common law); *Stewart v. American International Oil & Gas Co.*, 845 F.2d 196, 200 (9th Cir.1989) (citing *Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672, 676 (9th Cir.1980)); *Stowell v. Ted S. Finkel Investment Services, Inc.*, 641 F.2d 323, 325 (5th Cir.1981); *cf. Globus*, 418 F.2d at 1288 (no indemnity under securities laws where wrong is greater than ordinary negligence); *see also Stratton Group, Ltd. v. Sprayregen*, 466 F.Supp. 1180, 1185 n. 4 (S.D.N.Y.1979); *but see Greenwald v. American Medcare Corp.*, 666 F.Supp. 489, 493 (S.D.N.Y.1987) (third-party plaintiff entitled to prove he was without fault and did not violate securities laws and therefore entitled to indemnity).

■ While we do not reach the issue of whether indemnity is generally unavailable under the securities laws, we agree with the third-party defendants that indemnity is unavailable at least as to violations of

§ 10(b) because a violation of § 10(b) must be predicated on a finding of scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976); *see Globus*, 418 F.2d at 1288 (indemnity unavailable for reckless, wilful or criminal conduct). Accordingly, we dismiss AA's claims for indemnity as to the alleged violations of § 10(b) in the main action.

Finally, we find that indemnification is unavailable as to the RICO claims against AA in the main action. AA urges, without reference to authority, that this court apply to RICO cases the implied indemnification rule that "where actual fault is attributed to one party and another party is found at fault on some lesser level, the other party may have implied indemnification." Third–Party Plaintiffs' Sur-reply Memorandum ("Third–Party Pltfs' Sur–reply") at 7.

■ In addition to our disagreement with AA's expansive formulation of implied indemnity as discussed above, it is our view that to permit indemnity as to the RICO claims in the main action is inappropriate since the predicate offenses alleged in the main complaint, mail fraud, wire fraud, and securities fraud, require a finding of intent on the part of AA. *See Ernst & Ernst*, 425 U.S. at 193, 96 S.Ct. at 1380 (violations of § 10(b) require a finding of scienter); *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954) (the elements of mail fraud include a scheme to defraud); *cf. Globus*, 418 F.2d at 1288 (no indemnity for reckless, intentional or criminal misconduct); *see also Central Illinois Savings and Loan Association v. Dupage Co. Bank*, 622 F.Supp. 1493, 1498–1500 (N.D.Ill.1985) (no right to indemnity under RICO since cause of action is not implied under the statute and no federal common law right). Accordingly, we dismiss the third-party plaintiffs' claim for indemnity as to the RICO claims against them in the main action.

*Contribution*

The third-party defendants argue that contribution is unavailable with respect to alleged violations of RICO and federal se-

curities laws, as well as the common law fraud claims.

■ As an initial matter, in their answering papers AA does not oppose the NIDA Directors' assertion that contribution is unavailable for violations of RICO. Moreover, we are persuaded by Judge Lasker's cogent analysis in *Minpeco, S.A. v. Conticommodity Services, Inc.,* 677 F.Supp. 151, 154 (S.D.N.Y.1988), that courts are not empowered to create a federal common law of contribution under RICO, and that as a matter of law, there is no right to contribution under RICO. *See Miller v. Affiliated Financial Corp.,* 624 F.Supp. 1003, 1004 (N.D.Ill.1985) (contribution unavailable under RICO); *cf. Fleischhauer v. Feltner,* 879 F.2d 1290, 1301–02 (6th Cir.1989) (citing with approval the holding of *Miller, supra,* that no contribution is available under RICO). Accordingly, we dismiss AA's claim for contribution as to the alleged RICO violations alleged in the complaint to the main action (hereinafter the "primary complaint" or "main complaint").

AA further contends that if it is held liable to DED in the main action for federal securities laws violations, DED's injury was due to the independent acts of both AA and the NIDA Directors with the NIDA Directors' actions being far more egregious. Third–Party Pltfs' Memo. at 18–19. Thus, AA argues that it would have a claim for contribution against the NIDA Directors should it be found to have violated the federal securities laws in the main action. *Id.* at 19.

■ Contribution is an available remedy to defendants who are guilty of federal securities law violations. *See, e.g., Stratton Group, Ltd. v. Sprayregen,* 466 F.Supp. 1180, 1185 (S.D.N.Y.1979). For violations of § 10(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), this right of contribution exists between "joint tortfeasors." *See Greene v. Emersons, Ltd.,* 102 F.R.D. 33, 36 (S.D.N.Y.1983), *aff'd sub nom. Kenneth Leventhal & Co. v. Joyner Wholesale Co.,* 736 F.2d 29, 31 n. 1 (2d Cir.1984) (expressly declining to reach issue of how to define "joint tortfeasor").

AA urges an expansive definition of "joint tortfeasor" to include independent and concurrent tortfeasors. Third-party defendants urge a narrower definition of "joint tortfeasor" to exclude independent, successive or concurrent tortfeasors. There are no definitive answers resolving this difference to be found in the relevant Second Circuit case law. Indeed, the Second Circuit has expressly reserved judgment on this issue. *See Leventhal & Co.,* 736 F.2d at 31 n. 1.

In the Southern District of New York, both Judge Duffy in *Stratton Group,* and Judge Haight in *Greene* apply the narrower definition. *See, e.g., Stratton Group,* 466 F.Supp. at 1186 n. 7; *Greene,* 102 F.R.D. at 36. In *Greene,* Judge Haight reasoned that since the wrong contemplated by the securities laws is fraud, then contribution would lie only between knowing participants in the same fraud. *Id.* This situation is distinguishable, he asserted, from those involving common law tort cases of property damage where independent or concurrent acts of negligence may have contributed to a party's ultimate injury. *Id.* Consequently, Judge Haight concluded that "[t]here is no place for this broader concept of contribution in antifraud securities cases." *Id.; see also Alexander Grant & Co. v. McAlister,* 669 F.Supp. 163, 166 (S.D.Ohio 1987) (allegation of independent and concurrent action not sufficient under federal securities laws for contribution); *cf. Stowell v. Ted S. Finkel Investment Services, Inc.,* 641 F.2d 323, 325 (5th Cir.1981) (for contribution under federal securities laws there must be allegation of joint securities act wrongdoing).

On the other hand, in *Marrero v. Abraham,* 473 F.Supp. 1271, 1277–78 (W.D.La. 1979), the district court concluded that contribution under federal securities laws was available among independent, concurrent tortfeasors. It reasoned that since the purpose of contribution is to allow a fair allocation of damages among wrongdoers, a distinction between joint participants working on a common scheme and those who concurrently and independently cause damage to a party made no logical sense. *Id.*

at 1277–78. *See also Jordan v. Madison Leasing Co.*, 596 F.Supp. 707, 711 (S.D.N.Y.1984) (a finding of "joint liability" under the federal securities laws is based "on common liability to the injured party and not necessarily upon the same tort"); *but see Connecticut National Bank v. Reliance Insurance Co.*, 704 F.Supp. 506, 510 (S.D.N.Y.1989) (*Jordan* and *Greene* require that third-party defendant commit fraud on the plaintiff).

We do not disagree with either approach since they are in the context of slightly different, but significant, circumstances. Moreover, it is our view that the approach to the issue should not turn on how "joint tortfeasor" is defined but rather on an assessment of the goals of both the securities laws and contribution as undertaken by the *Greene* and *Marrero* courts.

■ We agree with Judge Haight that the wrong to be deterred by the federal securities laws is fraud in connection with the sale and purchase of securities. Given this particular purpose we also agree that an expansive definition of "joint tortfeasor" under the federal securities laws to include independent and concurrent tortfeasors who may be unaware and unconnected to a fraudulent securities scheme is inappropriate.

However, in *Marrero* the third-party complaint also alleged a violation of the federal securities laws by the *third-party defendants*. *Marrero*, 473 F.Supp. at 1276. It was the existence of two alleged independent violations of Rule 10b–5, one alleged in the complaint and one alleged in the third-party complaint, combining to produce a single injury to the plaintiff which formed the basis for the district court's

reasoning. *Marrero*, 473 F.Supp. at 1277. Allowing contribution in this circumstance is consistent with Judge Haight's concern that contribution under the federal securities laws be limited to those engaged in the kind of fraud that the securities laws contemplate.

■ It is our view that AA's claim for contribution for the securities laws violations fails under both the narrow view of "joint tortfeasor" articulated by Judges Haight and Duffy, and under the expansive view enunciated by the district court in *Marrero* since AA makes no allegation that the injury alleged to have been suffered by the plaintiff in the main action was also in part caused by violations of the securities laws by the third-party defendants. *See Alexander Grant & Co.*, 669 F.Supp. at 166 (claims for contribution should be proper only when party from whom it is sought has also allegedly violated federal securities laws) (citing *In re New York City Municipal Securities Litigation*, 507 F.Supp. 169, 189 n. 43 (S.D.N.Y.1980)); *cf. Tucker v. Arthur Andersen & Co.*, 646 F.2d 721, 727 n. 7 (2d Cir.1981) ("[U]nder the securities laws, a person who has defrauded the plaintiff in violation of those laws may be liable for contribution to another person who has similarly defrauded the plaintiff.").

In *Tucker, supra*, Judge Kearse, writing for the panel, agreed with the court below that the third-party complaint's contribution claim, strikingly similar to the instant one, stated a valid claim for contribution under the securities law.[8] *Tucker*, 646 F.2d at 727 n. 7; *see also Tucker v. Arthur Andersen & Co.*, [1973–74 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,544 (S.D.N.

---

**8.** The instant third-party complaint reads in relevant part:

> If the Andersen firms are held liable to the plaintiff under the Complaint ... and if it should be held that the third-party defendants are not liable to the Andersen firms for the full amount of plaintiff's claim against the Andersen firms, then the Andersen firms are entitled to a judgment that the third-party defendants, by reason of their misconduct and fault, contribute their equitable share to any such liability....

The third-party complaint in *Tucker, supra*, found to have validly stated a contribution claim under the securities laws read in relevant part:

> In the event defendant Andersen is held liable to plaintiffs for damages arising from Andersen's alleged failure to discover ... the embezzlement or misappropriation of funds ... then Andersen is entitled to recover such damages or to obtain contribution from one or more or all of third party defendants ... by reason of their fraud and deceit upon Andersen, as hereinafter set forth.

Y.1974); *State Mutual Life Assurance Co. of America v. Arthur Andersen & Co.,* [1973–74 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,543 (S.D.N.Y.1972), *aff'd,* 581 F.2d 1045 (2d Cir.1978). However, in stating that the securities law contribution claim in *Tucker* was proper, Judge Kearse implicitly had to have also concluded that an independent securities law violation committed by the *Tucker* third-party defendants against the plaintiff was also adequately alleged. *See Tucker,* 646 F.2d at 727 n. 7 (contribution under securities laws may be had only among those who violate securities laws). Therefore, AA's claim for contribution under the federal securities laws must be based on allegations that the third-party defendants violated securities laws, not based on allegations that the third-party defendants defrauded AA. *See Tucker,* 646 F.2d at 727 (defendant's right to contribution from third-party defendants depends on whether third-party defendants breached a duty to plaintiffs not third-party plaintiffs/defendants).

AA makes no allegation in the third-party complaint that the NIDA Directors violated any federal securities laws nor does AA argue in its memoranda that a violation of the securities laws has been committed by the third-party defendants. Instead, AA strenuously contends in support of its securities laws contribution claim only that

a "single injury" need be alleged to state a valid claim for contribution under the securities laws. *See, e.g.,* Third–Party Plaintiffs' Sur–Reply Memorandum in Opposition to Motion to Dismiss the Amended Third–Party Complaint ("Third–Party Pltfs' Sur–Reply") at 11–12; Third–Party Pltfs' Memo. at 18. For the reasons stated above and in light of the overwhelming case law to the contrary, we are unpersuaded by this argument.[9]

Accordingly, we dismiss the third-party plaintiffs' claims for contribution as to the securities laws violations alleged in the main action.[10]

Finally, the NIDA Directors urge dismissal of AA's claim for contribution as to the common law fraud claims alleged by DED in the main action. The NIDA Directors argue that Michigan law precludes contribution among intentional tortfeasors and as such, AA's claims for contribution as to the common law fraud claims must be dismissed as a matter of law. Third–Party Defendants' Memorandum of Law in Support of Motion to Dismiss ("Third–Party Defts' Memo.") at 10. AA argues that contribution is available among intentional tortfeasors under New York law. To decide this issue we must therefore determine whether Michigan or New York law applies.[11]

9. Further, it is our view that AA's allegations do not meet the pleading standards imposed as to allegations of securities fraud under Fed.R. Civ.P. 9(b). *See Zerman v. Ball,* 735 F.2d 15, 22 (2d Cir.1984) (particularity requirement of Rule 9(b) applicable to allegations of securities fraud).

10. We note that AA's liability for any securities law violation is grounded solely in any relationship between AA reports prior to the March 12th Amendment and the plaintiff's decision to enter into the March 12th Amendment. March 8th Decision at 1480. In our March 8th Decision we stated that there could be no § 10(b) claim in the absence of a connection between AA's reports and plaintiff's decision to purchase securities. March 8th Decision at 1480. Since third-party defendant Sim was even not a NIDA director until after the March 12th Amendment, he clearly could have had no connection with plaintiff's decision to enter into the March 12th Amendment and therefore could not under any circumstances be held liable under the securi-

ties laws even if AA had alleged that the NIDA Directors had violated the securities laws.

11. The third-party defendants contend that "perhaps" the law of Michigan applies to defendants/third-party plaintiffs' claims because the amended complaint "fails to specify the situs of any alleged misconduct" and because certain of the third-party defendants were directors of DMC, a Michigan corporation. Third–Party Defts' Memo. at 3 n. 2.

In addition, the third-party defendants assert that "it is possible that some or all of AA's claims would actually be governed by United Kingdom law...." *Id.* However, third-party defendants cite New York cases "where there appears to be no substantial difference between the law of New York and that of the United Kingdom." *Id.* The Second Circuit has stated that in cases involving the law of common law countries, "New York courts generally assume that the foreign law is the same as New York law." *Loebig v. Larucci,* 572 F.2d 81, 85 (2d Cir.1978). Further, "[w]hen there is no pre-

Contribution is designed to assure fairness in the allocation of liability. *See Tokio Marine & Fire Ins. v. McDonnell Douglas,* 465 F.Supp. 790, 800 (S.D.N.Y.1978), *aff'd,* 617 F.2d 936 (2d Cir.1980). New York law allows contribution among joint, concurrent, successive, independent, alternative and intentional tortfeasors. *See Bd. of Education v. Sargent, Webster, et al.,* 71 N.Y.2d 21, 27, 523 N.Y.S.2d 475, 478, 517 N.E.2d 1360, 1363 (N.Y.Ct.App. 1987). The purpose of such an approach is to assure an apportionment of damages among culpable parties according to the tortfeasors' relative degrees of fault. *Id.; see also Kelly v. Long Island Lighting Co.,* 31 N.Y.2d 25, 29, 334 N.Y.S.2d 851, 854, 286 N.E.2d 241, 242–43 (N.Y.Ct.App. 1972). However, Michigan law does not permit contribution among intentional joint tortfeasors. *See Moyses v. Spartan Asphalt Paving Co.,* 383 Mich. 314, 174 N.W.2d 797, 806 (1970). Michigan's purpose in excepting intentional tortfeasors from the right to contribution is to have its courts avoid lending aid "to rascals in adjusting differences among them." *Moyses,* 174 N.W.2d at 807 (quoting 1939 draft of the Uniform Contribution Among Tortfeasors Act). Therefore, a "true conflict" exists since the application of the New York rule would undermine Michigan's interest, whereas the application of the Michigan rule would undermine New York's interest. *See Bader by Bader v. Purdom,* 841 F.2d 38, 40 (2d Cir.1988).

A federal court sitting in diversity or adjudicating state law claims which are pendent to a federal claim applies the choice of law rules of the forum state. *See Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989) (citing *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). New York follows the approach of "giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Loebig v. Larucci,* 572 F.2d 81, 84 (2d Cir.1978) (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963)).[12]

It is the third-party plaintiffs' contention that the NIDA directors participated in or had knowledge of virtually all of the key transactions and events alleged in the complaint against AA in the main action. According to AA, if DeLorean and others were engaged in fraud and other unlawful activities, the NIDA Directors knew of it or should have known of it, and failed to inform DED, its predecessors, or other board members of DMC or DMCL. Third–Party Complaint at ¶ 17.[13]

Specifically, the third-party complaint alleges that approximately $17.65 million was unlawfully converted by DeLorean and others pursuant to the fraudulent GPD contract, approved by the NIDA Directors,

sumption that New York law is the same as foreign law, New York courts have decided the cases in accordance with New York law." *Id.*

In view of the third-party defendants' assertion that the New York law to which they cite is no different from the law of the United Kingdom, and the Second Circuit's approach to such foreign law issues, we confine our choice of law analysis between Michigan and New York law. *See Bartsch v. Metro–Goldwyn–Mayer, Inc.,* 391 F.2d 150, 155 n. 3 (2d Cir.1968) (courts not required to examine foreign law in absence of suggestion that such a course will be fruitful), *cert. denied,* 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968); *cf. Lehman v. Dow Jones & Co., Inc.,* 783 F.2d 285, 294 (2d Cir.1986) (court not obligated to investigate whether there are differences in law of jurisdictions when parties cite cases of only one jurisdiction).

Finally, neither party asserts that the application of New York or Michigan law as to the third-party plaintiffs' other claims would cause any substantive difference in their resolution.

**12.** The domiciles of the third-party defendants are Northern Ireland. Without deciding whether AA is one global partnership or separate partnerships, for the purposes of this issue we will assume the domiciles of defendants/third-party plaintiffs are Illinois, Ireland, and the United Kingdom since they are all different domiciles from that of third-party defendants.

**13.** AA's reports certifying the financial statements of DMC and DMCL were issued by the Detroit or New York offices of AA–USA. *See D.E.D. v. Arthur Andersen & Co.,* 683 F.Supp. 1463, 1469 (S.D.N.Y.1988).

executed between the DRLP [14] and DMCL and GPD Services, Inc. This contract, according to AA, was negotiated in part in New York, reviewed by New York attorneys, and monies due under it were drawn on New York banks.[15] Third–Party Pltfs' Memo. at 9. In addition, AA contends that NIDA Directors attended at least nine New York board meetings of DMC and DMCL at which they had the authority to inquire of the management as to all matters concerning the affairs of the corporations.[16] *Id.* at 1470–71. Since the domiciles of the parties are in different jurisdictions, and the alleged wrongs occurred either in New York or the United Kingdom, we find that New York law, rather than Michigan law, relating to contribution among intentional tortfeasors is applicable to the defendant/third-party plaintiffs' common law fraud claims. *Cf. Schultz v. Boy Scouts of American, Inc.,* 65 N.Y.2d 189, 201, 491 N.Y.S.2d 90, 98, 480 N.E.2d 679, 686–87 (N.Y.Ct.App.1985) (citing *Neumeier v. Kuehner,* 31 N.Y.2d 121, 128, 335 N.Y.S.2d 64, 70, 286 N.E.2d 454, 457 (N.Y.Ct.App. 1972)) (where parties' domiciles and place of tort are all different, the law of the place of the tort will apply unless application of another jurisdiction's law will advance the "relevant substantive law purposes without impairing the smooth working of the multi-state system or produc[e] great uncertainty for litigants").

Accordingly, we deny that part of third-party defendants' motion seeking dismissal of AA's contribution claim relating to the alleged fraud perpetrated against DED in the main action.

*Common Law Fraud Claims*

The third-party defendants contend that the fraud claims alleged in the third-party complaint are barred by the statute of limitations. We agree.

▮ The New York statute of limitations for common law fraud is six years

from the date of the commission of the fraud or two years from the date of discovery of the fraud, whichever is longer. *See, e.g., Warwick Materials v. J.K. Produce Farms, Inc.,* 111 A.D.2d 805, 806, 490 N.Y.S.2d 551, 553 (2d Dep't 1985); *Rickel v. Levy,* 370 F.Supp. 751, 755 (E.D.N.Y. 1974).

There is no dispute that AA's claims are deemed as interposed as of November 30, 1988, the date of the filing of the original third-party complaint. The latest tenure of a third-party defendant as a DMCL or DMC director ended in February of 1982, more than six years from the filing of AA's complaint. AA contends that due to the third-party defendants' fraudulent concealment of their allegedly wrongful activity, AA could not with reasonable diligence have asserted any claims against the NIDA Directors until August of 1986, when they were able to review DMC's books in connection with a different proceeding.

▮ AA argues that the third-party defendants acts of fraudulent concealment toll the applicable limitations period until August of 1986. It is their view that from August of 1986 they had a full six years, or until August of 1992, to bring a fraud claim. Third–Party Pltfs' Memo. at 75–76. We disagree.

In *Cestaro v. Mackell,* 429 F.Supp. 465, 469–70 (S.D.N.Y.1977), *aff'd,* 573 F.2d 1288 (2d Cir.1977), the district court held that "the federal concealment doctrine tolls the limitation period until 'discovery.'" *Id.* In that context the court asserted that it was clear from the legislative history that "for any New York action where the time to sue is extended because of failure to discover the wrong, the *maximum extension* should be two years." *Id.* at 469 (emphasis added). *See also Rickel,* 370 F.Supp. at 756–57 (two year period after discovery is applicable to fraud claims in which fraudu-

---

**14.** DRLP, of which DMC was the sole general partner, was formed to raise money for research and development of the DeLorean sports car.

**15.** The GPD contract recites that the place of legal jurisdiction shall be New York State and

that the contract "shall be governed by and construed in accordance with the laws of the State of New York." June 8, 1989 Affidavit of James D. Zirin, Exhibit 8.

**16.** DMC maintained its principal offices in New York.

lent concealment is alleged and the doctrine of equitable tolling is asserted by the plaintiff). Thus, even assuming *arguendo* that August of 1986 is the starting point for any calculation of time regarding the fraud claims, under the two-year discovery section of the New York statute of limitations for fraud AA's fraud claim would still be untimely since they only had until August of 1988 to interpose their claims but waited until November of 1988. Therefore, since the third-party plaintiffs waited longer than the required two years after the discovery of the alleged fraudulent behavior of the third-party defendants to bring their fraud claims, those claims are time-barred by the statute of limitations.

Moreover, AA's fraud claim fails to satisfy the particularity requirement of Fed.R. Civ.P. 9(b) ("Rule 9(b)").[17] Specifically, the NIDA Directors contend that the third-party complaint, which incorporates by reference much of the primary complaint, fails to identify the specific wrongdoing of each individual third-party defendant, and fails to recite any facts giving rise to an inference of scienter on the part of the third-party defendants. Further, they assert that the third-party complaint's fraud claims fail because AA does not allege what any of the third-party defendants were supposed to have obtained as a result of the fraud.[18]

▪ We begin our analysis with a reiteration of the basic principles regarding Rule 9(b). Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim to enable preparation of a defense; (2) protecting a defendant from harm to his reputation or goodwill; (3) reducing the number of strike suits. *See DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). While Rule 9(b) pleadings

may not be based on information and belief, fraud allegations may be so alleged as to facts peculiarly with the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based. *Id.* Fraud allegations ought to specify the time, place, speaker, and content of the alleged misrepresentations and where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. *Id.*

▪ To satisfy the requirements of Rule 9(b), "a complaint must adequately specify statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett et al.*, 886 F.2d 8, 11 (2d Cir.1989) (citing *Goldman v. Belden*, 754 F.2d 1059, 1069–70 (2d Cir.1985)); *see also Wolf v. Wagner Spray Tech Corp.*, 715 F.Supp. 504, 507–08 (S.D.N.Y.1989) (allegations of fraudulent statements and omissions do not satisfy Rule 9(b) without a recitation of the particular statements made, the reasons why those statements were fraudulent and the basis for the belief). This specificity requirement of fraud pleading is ameliorated when the complaint alleges representations made in documents which may be presumed to entail the collective action of directors and accountants, such as financial statements, annual reports, and the like. *See, e.g., Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 977 (E.D.N.Y.1988); *Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902, 911 (S.D. N.Y.1983).

While neither the primary nor third-party complaint alleges any specific misrepresen-

**17.** Fed.R.Civ.P. 9(b) reads in relevant part: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

**18.** Neither the third-party plaintiffs nor the third-party defendants dispute for the purposes of the instant motion that the primary com-

plaint adequately sets forth allegations of a fraudulent scheme perpetrated by John DeLorean and his associates. In addition, there is no dispute that a third-party complaint must be read in conjunction with a primary complaint incorporated by reference. *See Bozsi Ltd. Partnership v. Lynott*, 676 F.Supp. 505, 515 (S.D.N.Y. 1987).

**938**

tations made by any individual third-party defendant, AA argues that the primary complant provides each of the NIDA Directors with "encyclopedic detail" as to relevant dates, names, and circumstances of the DeLorean scheme, the GDP transaction in particular, which the NIDA Directors are alleged to have knowledge. Third–Party Pltfs' Memo. at 22. AA contends, therefore, that the combination of the two complaints gives each individual defendant notice of what misconduct he is charged with committing since the factual averments of the third-party complaint allege the NIDA Directors' access to information about and ratification of various fraudulent DeLorean transactions, their failure to disclose their knowledge of the DeLorean fraud to AA and the resulting injurious impact on AA of this failure to disclose. Third–Party Pltfs' Sur-reply at 14.

■ We believe that the fraud pleadings of AA do not conform to the requirements of Rule 9(b). Even assuming that the individual third-party defendants are sufficiently notified of the alleged wrongs they committed in ratifying certain DeLorean transactions in the primary complaint, they are still not apprised of the specific misrepresentations they allegedly made *to AA*, the victims of the alleged fraud perpetrated by the third-party defendants. Indeed, we do not agree with AA that recitation of particular acts by third-party defendants relied upon by the third-party plaintiffs as constituting the fraud charged is "unnecessary minutiae" for Rule 9(b) purposes.

Citing *Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902 (S.D.N.Y.1983), the third-party plaintiffs argue that where allegations of fraud rest upon alleged misrepresentations made in documents put forward by directors, identification of the role of individuals in the preparation of those documents is unnecessary to comply with the requirements of Rule 9(b). Third–Party Pltfs' Memo. at 30. However, in *Somer-ville* specific documents in which alleged misstatements were made were identified by the court, and where only categories of documents were identified, specific misstatements made by the defendants were also alleged.[19] *Somerville*, 576 F.Supp. at 911; *cf. Bruce v. Martin*, 691 F.Supp. 716, 722 (S.D.N.Y.1988) (Rule 9(b) requirements met when roles of individuals in the preparation of a private placement memorandum were not pleaded but document itself in which allegedly fraudulent misrepresentations were made was identified). Similarly in *Bozsi Ltd. v. Major Exploration, Inc.*, 676 F.Supp. 505 (S.D.N.Y.1987), upon which the third-party plaintiffs also heavily rely, the primary and third-party complaints were found to have alleged the time, place and content of specific misrepresentations made by the third-party defendants. *Bozsi Ltd.*, 676 F.Supp. at 515.

Neither the main nor third-party complaint identifies specific misrepresentations made to AA by any individual third-party defendant or even identifies specific documents in which misrepresentations are alleged to have been made, only that the third-party defendants "failed and refused to disclose" the fraudulent GPD transaction in unidentified financial statements supplied to AA. Third–Party Complaint at ¶ 17–18.

■ Rule 9(b) is designed to give each defendant fair notice of the claim so that he may frame a response to it. *Bruce*, 691 F.Supp. at 722. As such, the complaint need not plead evidence to satisfy the Rule's requirements. *Id.* However, to provide the individual third-party defendants meaningful notice of what fraudulent activity they are charged with committing, it is our view that at the very least, Rule 9(b) requires some identification of specific alleged misrepresentations or omissions in the financial statements supplied to AA by the boards on which the individual third-party defendants sat, particularly since the individual third-party defendants sat on dif-

**19.** Furthermore, the *Somerville* court expressly stated it was permitting "greater latitude in the pleading of fraud" because the injury alleged resulted from a fraud perpetrated on securities analysts and investors, rather than on the plaintiff directly. *Somerville*, 576 F.Supp. at 910 n. 11.

ferent boards at different times. *Cf. Morgan v. Prudential Group, Inc.*, 81 F.R.D. 418, 422–23 (S.D.N.Y.1978) (Rule 9(b) requirements not met in fraud pleading against officers and directors of defendant corporation when false statements or particular documents containing them are not identified). We hold the third claim for relief, the common law fraud claim, fails to comply with the requirements of Fed.R. Civ.P. 9(b).

Accordingly, for the above reasons we dismiss the third claim for relief (common law fraud) and the fourth claim for relief (aiding and abetting common law fraud) asserted in the third-party complaint.[20]

RICO

AA characterizes its second claim for relief against the NIDA Directors as one for "aiding and abetting the alleged RICO violations of John DeLorean and his co-conspirators." Third–Party Pltf's Memo. at 53. The basis of AA's second claim is that the third-party defendants allegedly aided and abetted DeLorean's RICO violations by failing and refusing to disclose the DeLorean scheme to AA, thereby injuring AA by virtue of damage to their professional reputation, actual and potential legal liabilities, and amounts paid for legal or investigative services. Third–Party Cmplt. at 11.[21] The third-party defendants raise numerous arguments in support of their motion to dismiss this cause of action. We agree with them that AA does not have standing to bring their aiding and abetting RICO claim.

In support of its claim, AA relies on *Alexander Grant & Co. v. Tiffany Industries ("Grant I")*, 742 F.2d 408 (8th Cir. 1984), *vacated*, 473 U.S. 922 (1985), *readopted ("Grant II")*, 770 F.2d 717, *cert. denied*, 474 U.S. 1058, 106 S.Ct. 799, 88 L.Ed.2d 776 (1986). In *Grant I* an accounting firm asserted RICO claims against a former audit client, claiming that it was the target of a pervasive scheme of mail and wire fraud designed by the defendants to obtain a favorable audit. *Grant I*, 742

F.2d at 409. The original complaint in *Grant I* specifically alleged 26 acts of mail fraud including letter forgeries by the defendants and 4 acts of wire fraud. *Id.* at 410. The plaintiff in *Grant I* alleged that it had been injured due to the defendant's RICO violations in that it had suffered, *inter alia,* damage to its business reputation and that it had been forced to spend large amounts for attorneys' fees. The Eighth Circuit held that plaintiffs had standing to bring the RICO claims and had alleged injury cognizable under RICO. *Grant I*, 742 F.2d at 412; *Grant II*, 770 F.2d at 719.

As a threshold matter, we believe the facts here are distinguishable from those in *Grant I*. In *Grant I*, plaintiffs alleged that the mail and wire fraud was aimed directly at them and, more importantly, that it was the predicate acts themselves that caused their injury. The instant third-party plaintiffs make no claim that they were either the targets of the DeLorean RICO violations or that they were in fact injured by DeLorean's predicate acts of mail and securities fraud. The instant third-party plaintiffs only assert the DeLorean scheme generally worked to their detriment because their reports did not reflect the scheme. Third–Party Cmplt. at 11.

The Supreme Court has held that a "plaintiff only has standing [to bring a RICO cause of action] if ... he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Various courts have held that standing to pursue a RICO action exists even though there is no allegation by the plaintiff that it was a target of the racketeering activity and even though the plaintiff only alleges that it suffered indirect injury. *See, e.g., Terre Du Lac Association, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467, 472 (8th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1460, 1461, 89 L.Ed.2d 718 (1986); *Lewis v. Lhu*, 696 F.Supp. 723,

---

**20.** We do not reach the third-party defendants' other contentions regarding the fraud claims.

**21.** We have previously held that the complaint in the main action alleged sufficient facts tending to show that DeLorean violated RICO. March 8th Decision at 1482.

727 (D.D.C.1988); *Pandick, Inc. v. Rooney,* 632 F.Supp. 1430, 1433 (N.D.Ill.1986).

Recently, the Second Circuit stated that the phrase "by reason of" in 18 U.S.C. § 1964(c) which provides for a civil remedy in RICO, "requires that there be a causal connection between the prohibited conduct and the plaintiff's injury."[22] *Norman v. Niagara Mohawk Power Corp.,* 873 F.2d 634, 636 (2d Cir.1989). The *Norman* decision cited with approval the approach to standing under RICO as enunciated in *Cullom v. Hibernia National Bank of New Orleans, Louisiana,* 666 F.Supp. 88 (E.D. La.1987), *aff'd,* 859 F.2d 1211 (5th Cir. 1988). *Norman,* 873 F.2d 637.

In *Cullom,* the court held that an employee who had been terminated for his refusal to participate in RICO-prohibited acts did not have standing to bring a civil RICO claim. *Cullom,* 666 F.Supp. at 90. It reasoned that the harm to plaintiff stemmed from his discharge, not from the predicate acts. *Id.* As such, the court stated that although the discharge may have "assisted" the racketeering scheme, "the discharge in itself is not conduct constituting a violation of RICO." *Id.* (quoting *Diamond v. Reynolds,* No. 84–280 MMS, slip op. at 6, 1986 WL 15375 (D.Del. July 15, 1986)). The *Cullom* court concluded by stating that "RICO does not shield every injury, nor does it insure against every wrong that can be traced to a predicate act." *Id.* at 91; *see also Cullom v. Hibernia National Bank ("Cullom II"),* 859 F.2d 1211, 1218 n. 15 (5th Cir.1988) (making distinction between injuries "traceable" to a RICO predicate act and injuries that "flowed from" a RICO predicate act); *Pujol v. Shearson/American Express, Inc.,* 829 F.2d 1201, 1205 (1st Cir.1987) (no standing to assert RICO claims if injury was not caused by predicate acts and plaintiff not a target of the pleaded predicate

acts); *Burdick v. American Express Co.,* 677 F.Supp. 228, 229–30 (S.D.N.Y.1988) (RICO provides no cause of action to individuals injured by acts other than those proscribed by RICO), *aff'd,* 865 F.2d 527 (2d Cir.1989).

Indeed, the seemingly varying approaches taken by the circuits with regard to standing under RICO, even those with a broad interpretation of the standing requirement, are consistent with respect to one element of pleading—plaintiff's alleged injury, whether a direct or indirect injury, must be caused by predicate RICO acts. *See Grant I,* 742 F.2d at 410–11 (defendants' acts of mail and wire fraud caused them to spend more time on audit, spend more on attorneys' fees, and damaged their business reputation); *Terre Du Lac,* 772 F.2d at 472 (defendants' acts of mail fraud injured plaintiffs by causing them to spend more money to maintain roads); *Lhu,* 696 F.Supp. at 727 ("[D]efendants' racketeering activities have injured plaintiff's reputation in the telecommunications industry").

The Second Circuit has asserted that legal liability under RICO does not extend as far as factual causation, only proximate causation. *Sperber v. Boesky,* 849 F.2d 60, 63–64 (2d Cir.1988). In its discussion of proximate causation, the Second Circuit stated that damages for "indirect injury" may be recovered under RICO if proximately caused by the predicate acts. *Id.* at 64. While unable to articulate a general rule regarding proximate causation, the Second Circuit did delineate categories of "indirect injury" which would be proximately caused by RICO-prohibited activity, and therefore possibly recoverable under RICO.[23] Such examples of "indirect injury" were the following: (1) damages suffered by those who without a direct threat made against them were intimidated into conduct in response to offenses committed

**22.** 18 U.S.C. § 1964(c) reads in relevant part: Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

**23.** The *Sperber* court assumed for the sake of its proximate cause discussion, but explicitly stated it did not so hold, that its enumerated examples could recover under RICO. *Sperber,* 849 F.2d at 64.

against others; (2) damages suffered by purchasers of the racketeer's goods or services who are forced to pay higher prices; (3) an "honest investor" who is displaced when a racketeer infiltrates and obtains control of a business. *Id.* at 64–65. In short, the Second Circuit concluded that plaintiffs who are either targets of the racketeering enterprise, competitors or customers of the racketeer are those plaintiffs who were probably intended by Congress to recover under RICO. *Id.* at 65.

■ Third-party plaintiffs meet none of the standards articulated by the relevant Second Circuit case law. Assuming *arguendo* that the third-party defendants' failure to disclose DeLorean's fraudulent scheme caused AA injury, any harm to AA stemmed from the alleged non-disclosure by the NIDA Directors rather than from DeLorean's predicate acts themselves. *Cf. Burdick v. American Express Co.*, 865 F.2d 527, 529 (2d Cir.1989) (to establish standing under RICO plaintiff must show damage to business or property resulted from the predicate acts constituting the RICO violation). In other words, any non-disclosure of the RICO scheme by the third-party defendants—the actual conduct that AA alleges caused it injury—is not in itself conduct prohibited by RICO, nor does AA contend that it is. The third-party complaint itself solely alleges injury flowing from the failure to reflect the DeLorean scheme, not injuries flowing from the DeLorean scheme itself or its predicate acts.[24]

Therefore, in light of the approach endorsed by the Second Circuit in *Norman* and *Sperber, supra,* we hold that AA's claimed injuries were not proximately caused by DeLorean's RICO predicate acts. Accordingly, we conclude that the third-party defendants have no standing to bring their second claim for relief for aiding and abetting RICO violations pursuant to 18

U.S.C. § 1962(a), (b) and (c). *See Cullom II,* 859 F.2d at 1215 n. 9 (RICO's proximate causation requirement is an aspect of standing).

Moreover, the Second Circuit has indicated that civil liability under RICO may be found upon proof that the defendant aided and abetted the predicate acts. *See U.S. v. Rastelli,* 870 F.2d 822, 832–33 (2d Cir.1989), *cert. denied sub nom. Agar v. U.S.,* —— U.S. ——, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989); *see also Petro–Tech, Inc. v. Western Company of North America,* 824 F.2d 1349, 1356 (3rd Cir.1987) ("[I]f all of RICO's other requirements are met, an aider and abettor of two predicate acts can be civilly liable under RICO."); *Armco Industrial Credit Corp. v. SLT Warehouse Co.,* 782 F.2d 475, 485–86 (5th Cir.1986) (for civil liability as aider and abettor there must be evidence that defendant shared in criminal intent of the principals); *Zola v. Gordon,* 685 F.Supp. 354, 375 (S.D.N.Y.1988) (plaintiff must provide factual allegations showing how defendant participated as an aider and abettor in the requisite predicate acts); *Laterza v. American Broadcasting,* 581 F.Supp. 408, 412 (S.D.N.Y.1984) (general and conclusory allegations of defendants' continued association with parties in the knowledge of those parties' illegal activity is insufficient to establish criminal aiding and abetting liability).

■ The instant third-party complaint fails to allege sufficient facts as to how each individual defendant participated as an aider and abetter in the predicate acts alleged to have been committed by DeLorean. *Cf. Laterza,* 581 F.Supp. at 412 ("Plaintiffs, in amending their complaint, are directed to allege with supporting factual allegations how *each* of the individual [defendants] participated as an aider or abettor in the requisite two predicate

---

**24.** For example, in order to recover under 18 U.S.C. § 1964(c) for a violation of 18 U.S.C. § 1962(a), a plaintiff must allege that he was injured as a result of the use or investment of income derived from racketeering activity. *See, e.g., In re Gas Reclamation, Inc.,* 659 F.Supp.

493, 511 (S.D.N.Y.1987); *DeMuro v. E.F. Hutton,* 643 F.Supp. 63, 66 (S.D.N.Y.1986). AA makes no claim that its alleged injuries were a result of DeLorean's use of income derived from his racketeering activity, only that they were in-

**942**

acts.") (emphasis original).[25] Thus, even if we were to decide that third-party plaintiffs had standing to assert their aiding and abetting RICO claim, the allegations of their complaint do not meet the requirements for such a cause of action. Indeed, the third-party complaint only generally avers the complicity in the DeLorean acts by the NIDA Directors. There is no attempt by the third-party plaintiffs to allege any specific activity by any specific director furthering any specific RICO predicate acts alleged to have been committed by DeLorean. Therefore, for the reasons stated, we dismiss the third-party plaintiff's second cause of action against the NIDA Directors for aiding and abetting the RICO violations of John DeLorean.[26]

*Negligence*

The NIDA Directors allege that the negligence claims are barred by the statute of limitations. We agree. The New York statutory period allowed for bringing a negligence claim is three years from when the acts or omissions constituting negligence produce injury to the plaintiff. *See Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 744 (2d Cir.1979). There is no dispute that absent any toll or estoppel the negligence claim would be time-barred since the acts complained of by AA occurred more than three years before the filing of its original third-party complaint on November 30, 1988. AA in its third-party complaint alleges that it did not know and could not have known of the third-party defendants' wrongful conduct until July 16, 1984 and November 11, 1985 when the Committee of Public Accounts issued its reports on its investigation of DMC and DMCL and August 1986 during discovery in connection with another proceeding. AA avers that while it had "suspected" wrongdoing by the third-party defendants in 1984 and 1985, it was not until August of 1986 that AA could have known of the true conduct of the NIDA Directors. Third-Party Pltf's Sur–Reply Memo. at 31–33; Third–Party Cmplt. at 10–11. Accordingly, AA invokes the doctrine of equitable estoppel and equitable tolling to preserve its negligence claim. It is AA's contention that they have pleaded affirmative acts of concealment committed by the third-party defendants such that a set of facts could be constructed to estop the third-party defendants from asserting the statute of limitations as a defense.[27] Therefore, they conclude that the motion to dismiss claim the negligence claim as time-barred should be denied.

jured as a result of the third-party defendants alleged failure to disclose DeLorean's activities.

**25.** In our March 8th Decision we held that plaintiffs, DED, adequately made out an aiding and abetting RICO cause of action by referring to the standards for aiding and abetting liability under the securities laws. March 8th Decision at 1482–83; *cf. Mishkin v. Peat, Marwick, Mitchell & Co.*, 658 F.Supp. 271, 272 (S.D.N.Y.1987) ("Civil liability for aiding and abetting federal securities fraud ... requires proof (1) of a violation by a primary wrongdoer; (2) knowledge of the violation by the person sought to be charged; (3) that the person sought to be charged 'substantially assisted' in the achievement of the primary violation."); *Zola v. Gordon*, 685 F.Supp. 354, 375 n. 27 (S.D.N.Y.1988) (to allege aiding and abetting liability generally a plaintiff must allege (1) the existence of a wrong committed by primary offender; (2) the rendering of substantial assistance by the aider and abettor; and (3) the requisite scienter on the part of the aider and abettor).

In light of the Second Circuit's dicta in *Rastelli, supra,* indicating that for a RICO aiding and abetting claim participation in the predicate acts by the aiders and abettors must be alleged, we reviewed the allegations in the First Amended Complaint in the main action. Upon review, we see no reason to depart from our original holding that plaintiffs adequately made out an aiding and abetting RICO cause of action even under the more stringent framework discussed in *Rastelli.*

**26.** We do not reach the third-party defendants' other contentions regarding the aiding and abetting RICO claim.

**27.** AA alleges in the third-party complaint that the NIDA Directors:

1. misrepresented the reasons for DMC's and DMCL's insolvency;
2. provided the governmental committee investigating the British Government's investment in DMC and DMCL with misleading evidence;
3. released misleading statements to the press;
4. testified in an incomplete and misleading manner concerning DMC, DMCL, and the GPD transactions in a separate proceeding.

■ There is some lack of clarity in this circuit as to exactly what constitutes equitable estoppel and equitable tolling. The Second Circuit has stated that the difference between equitable tolling and equitable estoppel is that the former is "invoked in cases where the plaintiff is ignorant of his cause of action because of the defendant's fraudulent concealment, [whereas] equitable estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit." *Cerbone v. International Ladies' Garment Workers Union,* 768 F.2d 45, 49–50 (2d Cir.1985). However, in *Renz v. Beeman,* 589 F.2d 735 (2d Cir. 1978), the Second Circuit stated that equitable estoppel "may also arise when affirmative fraudulent statements are made which conceal from the plaintiff facts essential to make out the cause of action." *Id.* at 750. Whatever the definition, the effect of each is different. Equitable estoppel addresses itself to circumstances in which a statute of limitations defense would be inapplicable as a whole. *See Zola v. Gordon,* 685 F.Supp. at 361 n. 6 (S.D.N.Y.1988). Equitable tolling concerns itself only with when the statute of limitations period begins to run. *Cerbone,* 768 F.2d at 48. Further, it is clear that the application of the federal equitable tolling doctrine is inapplicable to AA's common law negligence claim since the doctrine "tolls the statute of limitations with regard to *federally created* causes of action sounding in fraud or *federally created* causes of action which have been fraudulently concealed...." *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 553 n. 26 (S.D.N.Y.1977) (citing *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946)) (emphasis added).

■ It is our view that equitable estoppel principles are also inapplicable in this case. First, we think that the *Cerbone* formulation represents the most accurate and workable formulation of the doctrine. As such, according to *Cerbone,* equitable estoppel applies when the plaintiffs are induced to refrain from timely filing a known cause of action by the defendants. *See*

*also Moll v. U.S. Life Title Insurance Co. of New York,* 700 F.Supp. 1284, 1293 (S.D.N.Y.1988). The instant third-party plaintiffs allege quite clearly that they were unaware of their cause of action until August of 1986. Second, when the equitable estoppel is based upon actual misrepresentations by the defendant, the plaintiff is required to allege that justified reliance upon the misrepresentation was the reason for not timely instituting the action. *See Jordan v. Ford Motor Co.,* 73 A.D.2d 422, 426 N.Y.S.2d 359, 360 (4th Dep't 1980). Where the estoppel is based upon concealment without misrepresentation, "the courts have invoked estoppel only where there was a fiduciary relationship which gave defendant an obligation to inform plaintiff of facts underlying the claim." *Id.* 426 N.Y.S.2d at 360–61.

■ AA makes no allegation that its failure to timely institute its third-party action was due to its justified reliance upon a misrepresentation by the NIDA Directors to them. Indeed, in its recitation of the alleged affirmative misrepresentations made by the third-party defendants, AA charges one instance of misrepresentation was allegedly made on October 28, 1986 which was two months after AA alleges it discovered the basis for its third-party action. Further, at least two of the remaining four allegations of misrepresentation concern representations made to entities other than AA—the British Government and the press. It is significant to note that the alleged misrepresentations made to the British Government were in the context of its investigation into the DeLorean investments. However, it was the reports of precisely these investigations that AA contends first alerted it to possible wrongdoing by the third-party defendants. The final allegations of concealment are merely conclusory statements that the third-party defendants "misled the Andersen firms during the course of their audit work" and "misrepresented the reasons for DMC's and DMCL's insolvency." Third–Party Cmplt. at 9. Finally, there is no claim that a fiduciary relationship existed between the parties such that mere concealment of the

facts would give rise to the doctrine. It is our view that these allegations are insufficient to trigger the doctrine of equitable estoppel. *See Moll*, 700 F.Supp. at 1289 ("Conclusory allegations of fraudulent concealment are not sufficient to withstand a motion to dismiss.").

Moreover, under New York law, the "due diligence on the part of the plaintiff in bringing his action is an essential element for the applicability of the doctrine of equitable estoppel." *Simcuski v. Saeli*, 44 N.Y.2d 442, 450, 406 N.Y.S.2d 259, 263, 377 N.E.2d 713, 717 (1978). The *Simcuski* Court asserted that "the burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." *Id.* The length of the statutory period itself, in this case three years, "sets an outside limit on what will be regarded as due diligence." *Id.* at 451, 406 N.Y.S.2d at 263, 377 N.E.2d 717.

In *Zola v. Gordon, supra*, the district court construed due diligence as "a reason to suspect the probability of any manner of wrongdoing." *Zola*, 685 F.Supp. at 367 (construing "due diligence" in the context of the equitable tolling doctrine). In *Klein v. Shields & Company*, 470 F.2d 1344 (2d Cir.1972), the Second Circuit concluded constructive knowledge of appellant's claims would be imputed to him because the appellant "with reasonable diligence" could have discovered his claims by a certain date since "[a]t that point in time, at least the possibility of fraud should have been apparent...." *Id.* at 1347 (construing constructive knowledge of fraud); *see also Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975) ("Any fact that should excite his suspicion is the same as actual knowledge of his entire claim."); *but see Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983) (constructive knowledge of fraud will be imputed when the circumstances suggest to a person of ordinary intelligence the "probability" that he has been defrauded and he fails to fulfill his duty of inquiry).

Nowhere in its amended third-party complaint does AA allege what inquiry it undertook to investigate the possibility of bringing claims after its "suspicions" were aroused in July of 1984 and early November of 1985. Thus, even accepting AA's allegations of fraudulent concealment as alleged in the third-party complaint and assuming that the doctrine of equitable estoppel would be applicable to the instant claims, the negligence claim would still be time-barred as a matter of law since third-party plaintiffs have failed to also allege they made any inquiry as to the wrongdoing of the NIDA Directors after having their "suspicions" aroused after July of 1984 and early November of 1985. *See Moll*, 700 F.Supp. at 1293 ("A party seeking to avoid the bar of the statute [of limitations] must aver and show that he used due diligence to detect it....") (construing "due diligence" in the context of equitable tolling and quoting *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 143, 25 L.Ed. 807 (1879)).

We therefore dismiss the fifth claim for relief for negligence as alleged in the amended third-party complaint.[28]

### Conclusion

For the reasons articulated above, the motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) and 12(b)(6) of third-party defendants Alex H. Fetherstone, C. Shaun Harte, Ronald J. Henderson, Anthony S. Hopkins, and James Sim is granted as to the second, third, fourth, and fifth causes of action as alleged in the amended third-party complaint.

The motion to dismiss is granted as to the first cause of action with respect to the claims for indemnity for violations of RICO, the federal securities law and fraud claims in the main action, and the claims for contribution as to the RICO and federal securities law claims in the main action. The motion to dismiss the first cause of action is denied with respect to the third-party plaintiffs' indemnity claim for negli-

---

**28.** We do not reach the third-party defendants' other contentions regarding the negligence claim.

gence in the main action, and with respect to the contribution claims as to fraud and negligence in the main action.

Finally, we grant the third-party defendants' motion to dismiss Ronald J. Henderson as a third-party defendant.

SO ORDERED.